IN THE SUPREME COURT OF THE STATE OF DELAWARE

IN RE NUMODA CORPORATION

§ No. 121, 2015
§
§ Court Below:  Court of Chancery
§ of the State of Delaware,
§ in and for New Castle County
§
§ Consol. C.A. No. 9163-VCN

Submitted: October 14, 2015
Decided:    October 22, 2015

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

# **O R D E R**

This 22nd day of October 2015, upon consideration of the parties' briefs and the record below, and after oral argument, it appears to the Court that:

(1) This factually complicated case involves one of the first uses by litigants of new provisions of the Delaware General Corporation Law ("DGCL") that authorize the Court of Chancery to issue final orders cleaning up important issues involving the governance of a Delaware corporation that were dealt with in a manner that did not meet the statutory requirements for validity.[1]  Sections 204 and 205 of the DGCL make it clear

---

[1] *See* 8 *Del. C.* §§ 204, 205.  These new sections of the DGCL, which became effective on April 1, 2014, enable the board of a Delaware corporation to ratify, and grant the Court of Chancery authority to validate, corporate acts that were taken without adherence to corporate formalities under the DGCL or the corporation's organizational documents, referred to as "defective corporate acts."  Section 204 provides that "no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified [under § 204] or validated by the Court of Chancery in a proceeding brought under § 205."  *Id.* § 204(a).  In the words of the General Assembly, § 204 "provides a safe harbor procedure for ratifying corporate acts or transactions and stock that, due to a 'failure of authorization', would be void or voidable."  H.R. 127, 147th Gen. Assem., (Del. 2013).  That ratification procedure involves adopting

that the Court of Chancery may issue binding orders clarifying the capital structure of corporations when it is satisfied that a corporation's board had the authority to, and intended to, authorize and issue stock. The Court of Chancery's past inability under prior case law to validate stock, even when inequity would result by failing to do so, was a core motivation for the adoption of these provisions.[2] Further, the adoption of these provisions addressed the reality that many corporations—particularly those that are controlled, as here, by family members or friends engaging in start-ups or relatively small businesses—have taken short-cuts in authorizing and issuing stock.

(2) This case involves such a scenario. The appellants, John A. Boris and Ann S. Boris, are two of the three siblings who founded and effectively controlled nominal parties, Numoda Corporation, Inc. ("Numoda Corp.") and Numoda Technologies, Inc. ("Numoda Tech."), for many years. In fact, John and Ann were the ones responsible for ensuring Numoda Corp.'s compliance with corporate formalities because John initially held the position of Secretary, and Ann took over that position when John resigned. The appellees in this case include i) John's and Ann's sister, Mary S. Schaheen, who initially

---

resolutions, obtaining stockholder approval if such approval is legally required, and filing a certificate of validation in accordance with 8 *Del. C.* § 103. *See* 8 *Del. C.* § 204.

According to the General Assembly, § 205 "confers jurisdiction on the Court of Chancery to hear and determine the validity of any ratification effected pursuant to § 204, the validity of any corporate act or transaction and any stock or rights or options to acquire stock, and to modify or waive any of the procedures set forth in § 204." H.R. 127, 147th Gen. Assem., (Del. 2013). Section 205 "also confers jurisdiction on the Court of Chancery to hear and determine the validity of any defective corporate act that has not been ratified or ratified effectively pursuant to § 204, regardless of whether such defective corporate act would have been capable of ratification pursuant to § 204." *Id.*

[2] The General Assembly noted that "§ 204 is intended to overturn the holdings in case law . . . that corporate acts or transactions and stock found to be 'void' due to a failure to comply with the applicable provisions of the General Corporation Law or the corporation's organizational documents may not be ratified or otherwise validated on equitable grounds." *Id.*

served as the President and Chief Executive Officer, and a director, of Numoda Corp., as well as a director of Numoda Tech.; ii) John W. Houriet, who served as Numoda Corp.'s Chief Technology Officer, and as the President and a director of Numoda Tech.; and iii) Patrick J. Keenan, who performed legal work for the Numoda entities.

(3) On appeal, John and Ann challenge the Court of Chancery's determinations regarding the capital structure of Numoda Corp.[3] Those determinations did not give Mary all she wanted, but did result in a finding that John and Ann collectively own 37.51% of Numoda Corp.'s voting stock, Mary owns 37.08%, and other parties own the rest.[4] After the determinations of the Court of Chancery, Mary's shares of voting stock and those of her fellow appellees, Houriet and Keenan, gave them a combined 58.88% of the voting power of Numoda Corp.[5] They used that voting power to remove John and

---

[3] *See In re Numoda Corp. S'holders Litig.*, C.A. No. 9163-VCN, 2015 WL 402265 (Del. Ch. Sept. 25, 2014).

[4] *Id.* at *15. John and Ann also argue on appeal that the Court of Chancery erred by determining that Mary was entitled to 5,725,000 additional shares of voting stock as compensation for her work because any grant to Mary was subject to the entire fairness standard because she was an interested fiduciary. This argument comes with little grace for an important reason: the record amply supports the Court of Chancery's conclusion that John and Ann, who were also fiduciaries, supported the grant to Mary, believed it had happened, and only years later tried to rely on the lack of corporate formalities to deny that the stock grant to Mary was valid so as to further their aim to take control of Numoda Corp. for themselves. As the Court of Chancery held, John and Ann had acquiesced in the grant for years, never challenged it on equitable grounds, and as Mary and the other appellees point out, they did not even raise this issue properly in their pleadings below. In an action under §§ 204 and 205, the Court of Chancery is not obliged to permit parties to raise untimely equitable challenges in a proceeding established by the General Assembly as a way to resolve failures in corporate formalities that stand in the way of corporate stakeholders having their fair and settled expectations vindicated. That is especially the case when the parties seeking to wield equity as a sword endeavor to use it to strike down their own prior actions for self-interested reasons. Further, in case of any doubt, we find that any equitable challenge in a later action to any of the issuances addressed in this action caused to be brought by John and Ann would now be untimely.

[5] *See id.* at *15 n.149 (noting that Mary, Houriet, and Keenan "collectively held 58.88%" of Numoda Corp.'s voting stock).

Ann from the board, and then from their officer positions, at Numoda Corp., and to seat a board that they preferred.[6]

(4) John and Ann also challenge the Court of Chancery's refusal to issue additional relief spinning off Numoda Tech. to the equity owners of Numoda Corp. On this point, the Court of Chancery noted that there was evidence that the spin-off was once intended and that, after the spin-off, Numoda Tech. would be owned in the same proportion as its creator and parent, Numoda Corp.[7] But the Court of Chancery found it more prudent not to order a spin-off and not to validate subsequent purported grants of Numoda Tech.'s stock to Numoda Corp. or its stockholders.[8] In so doing, the Court of Chancery recognized that its determination of the capital structure of Numoda Corp. would protect any expectancy in Numoda Tech. because Numoda Corp. would own Numoda Tech. in its entirety and have to operate it for the benefit of Numoda Corp. and its stockholders.[9] Not only that, the Court of Chancery indicated that the board of Numoda Corp. would have a duty to all of its stockholders if it determined to spin off Numoda Tech. and that duty would require it to take into account the ownership proportions that the Court of Chancery had determined were in place at Numoda Corp.[10]

---

[6] *See* Answering Br. at 3 n.3 ("Consistent with the final order, entered on March 10, 2015, Keenan, Houriet, and Mary executed a written consent removing the Borises as officers and directors of Numoda Corp. and electing Mary and Houriet to the board.").

[7] *See In re Numoda Corp.*, 2015 WL 402265, at *12.

[8] *See id.*

[9] *See id.* ("The Court notes that declining to award ownership to the shareholders, as opposed to finding that Numoda Tech.'s stock is controlled by Numoda Corp. itself . . . will not significantly harm any of the parties, Numoda Corp.'s other shareholders, or outsiders to whom the parties made representations.").

[10] *See id.* at *12 n.119 ("The Numoda Corp. board must exercise its good faith judgment to distribute Numoda Tech.'s stock. The Court's findings regarding the parties' prior

4

(5) As complex as this case has been for the Court of Chancery to resolve given the lax practices of the parties and others in governing the Numoda entities, it presents rather simple issues on appeal. As much as John and Ann may disagree with the Court of Chancery's factual findings that led to its conclusions regarding Numoda Corp.'s capital structure and ownership distribution, those findings are well-grounded and supported by substantial evidence. In fact, the Court of Chancery grounded many of its determinations that the board had intended to grant stock to particular individuals in documents authored or signed by John and Ann themselves.[11] Sections 204 and 205 were adopted in part to address situations that had arisen in prior cases, which are analogous to this one, where parties who are complicit in failing to comply with the DGCL's requirements refuse to participate in the validation of their own past intended actions because they have come to have personal reasons to wish to disclaim their prior promises and actions.[12] Because

---

representations and working understanding of mirror-image capital structures should be informative.").

[11] *See id.* at *10 ("The parties operated for years assuming the capital structure [that they now contest] and made consistent representations [about that structure] to outsiders."); *id.* at *10 n.110 ("For example, Ann, John, and Mary made certain representations [about the contested capital structure] to banks and public authorities."); *id.* at *11 (observing that essentially all of John's and Ann's representations before the litigation show that they did not question the validity of a capital structure incorporating a grant of 5,725,000 shares of voting stock to Mary, and that by validating this grant to Mary, John and Ann will be put in a position where they had long represented they were); *id.* at *12 ("[V]alidating the grant of voting stock [to Houriet] will put the parties closer to their long-represented capital structure . . . .").

[12] *See supra* note 2; *see also In re Numoda Corp.*, 2015 WL 402265, at *11 ("The equities will not permit Ann and John to renege on a prior commitment in order to enhance their personal interests."); C. Stephen Bigler & John Mark Zeberkiewicz, *Restoring Equity: Delaware's Legislative Cure for Defects in Stock Issuances and Other Corporate Acts*, 69 BUS. LAW. 393, 399–401 (2014) [hereinafter *Restoring Equity*] (explaining that part of the reason §§ 204 and 205 were necessary was to enable courts to address the inequitable results in certain prior cases where individuals who participated in actions that did not comply with corporate formalities later tried to benefit by challenging the legal validity of those very actions).

John and Ann are themselves responsible for not adhering to corporate formalities and because they acquiesced in the stock grants they now dispute, they are poorly positioned here to argue that past informal grants and returns of Numoda Corp.'s stock were invalid. The Court of Chancery thoroughly explained the basis for its conclusions as to Numoda Corp.'s capital structure in its detailed opinion. Given that reality, there is no basis for us to overturn its judgment.

(6) That includes our rejection of John's and Ann's argument that the disputed share issuances could not be cured under § 205 because there was no admissible evidence of an attempt to issue those shares, and their confusing argument that once the Court of Chancery validated the authorization of the disputed stock, the disputed issuances no longer fell within the definition of a "defective corporate act" because they were not "void or voidable due to a failure of authorization."[13] As a factual matter, the Court of Chancery had ample evidence, including the documents authorized and signed by John and Ann, to support its findings not only that the board of Numoda Corp. intended to authorize the shares in question, but that it also intended to issue them to specific parties.[14] As for the Kafkaesque argument that once the Court of Chancery's determination cured the failure in board authorization, then it could not make sure the shares went to the parties who were supposed to receive them because the issuances fell out of the definition of "defective corporate act," we reject this interpretation of §§ 204 and 205. Precisely because those sections were intended to cure inequities, "failure of

---

[13] Opening Br. at 24 (citing 8 *Del. C.* § 204(h)).
[14] *See* supra note 11.

authorization" must be read broadly to allow the Court of Chancery to address any technical defect that would compromise the validity of a corporate action.[15]

(7) Likewise, John's and Ann's argument that the Court of Chancery abused its discretion by failing to order the spin-off of Numoda Tech. is without merit. Section 205 gives the Court of Chancery substantial leeway to shape an appropriate remedy.[16] We perceive no abuse of discretion in the Court of Chancery's careful conclusion not to heap a spin-off on top of this convoluted corporate-governance struggle, to allow Numoda Corp. to operate under a board selected by the stockholders as determined in this action, and to permit that board to decide whether, in view of current circumstances, a spin-off is in the best interests of the corporation's stockholders. By refusing this relief, the Court of Chancery recognized that the stockholders were protected by their ownership interests in Numoda Corp. itself,[17] and by the legal and fiduciary duties the Numoda Corp. board would owe it if it decided to spin off Numoda Tech. in the future.[18] We see no basis to

---

[15] "'Failure of authorization' means (i) the failure to authorize or effect an act or transaction in compliance with the provisions of this title, the certificate of incorporation or bylaws of the corporation, or any plan or agreement to which the corporation is a party, if and to the extent such failure would render such act or transaction void or voidable, or (ii) the failure of the board of directors or any officer of the corporation to authorize or approve any act or transaction taken by or on behalf of the corporation that would have required for its due authorization the approval of the board of directors or such officer . . . ." 8 *Del. C.* § 204(h)(2); *see also Restoring Equity*, *supra* note 12, at 404 (observing that the term "'failure of authorization' . . . may generally be thought of as the defect giving rise to the need for ratification").

[16] *See* 8 *Del. C.* § 205(b)(10) (allowing the Court of Chancery to "[m]ake such other orders regarding [a determination of the validity and effectiveness of any defective corporate act or ratification] as it deems proper under the circumstances"); *id.* § 205(d)(5) (allowing the Court of Chancery to consider "[a]ny other factors or considerations [it] deems just and equitable" in determining whether to validate defective corporate acts).

[17] *See supra* note 9.

[18] *See supra* note 10.

second-guess the judgment of our court of equity in shaping its approach to relief in this case.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Court of Chancery is AFFIRMED. The parties are directed to confer and advise the Court before October 30, 2015, if, in their view, this decision resolves the related stayed appeal in *Schaheen v. Boris*,[19] as it would seem to have mooted any remaining issues in that separate case.

BY THE COURT:

*/s/ Leo E. Strine, Jr.*
Chief Justice

---

[19] No. 13, 2014 slip op. (Del. Sept. 12, 2014).

8